**THE POSTER LAW FIRM, PLLC**
11022 N. 28th Drive, Suite 290
Phoenix, Arizona 85029
Phone: (602) 449-9806

Rick Poster # 018115
rick.poster@azbar.org
Attorney for the Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Foundations Investment Group, LLC; and FIG Global, LLC, | NO. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| Sultan Alshaie; Nassir Alshaie; Ahmed Alshaie; Bernard Otremba-Blanc; Alshaie Family Trust; Royal Holdings, LLC; Royal Energy LLC; Unknown Does 1-100; XYZ Entities 1-100, | |
| Defendants. | |

The Plaintiffs, by and through its undersigned attorney, for their Complaint against the Defendants named herein, alleges as follows:

### JURISDICTION

1.      This Court has jurisdiction pursuant to 28 USC § 1332, because the Plaintiffs are citizens of the State of Arizona and California, some Defendants are citizens of the State of Arizona, and some Defendants are citizens of other jurisdictions.

2.      This Court also has jurisdiction pursuant to 28 USC § 1351, as one Defendant

claimed to be an honorary Consul of the German Government, and one or more Defendants claimed to be member(s) of the Saudi Royal Family.

3.      The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, as the Plaintiffs allege that the Defendants owe the Plaintiffs an estimated $94,889,807.03.

4.      Venue is proper in this Court.

**PLAINTIFFS**

5.      The Plaintiffs are:

A.      Foundations Investment Group, LLC, 2575 E. Camelback Road, Suite 450 Phoenix, Arizona, 85016.

B.      FIG Global, LLC, 777 E. Tahquitz Canyon Way, Suite 200, Palm Springs, California, 92262.

6.      At the time of the Defendants' acts, the Plaintiffs were located in the greater Phoenix area, Maricopa County, Arizona, and in Riverside County, California.

7.      The Plaintiffs can be reached at the office of their attorney whose name and address is:

Rick Poster
Attorney at Law
11022 N. 28th Drive, Suite 290
Phoenix, AZ  85029
602-449-9806 (phone)
602-449-0401 (fax)

**DEFENDANTS**

8.      The Defendants at this time are:

A.     Sultan Alshaie, 23510 N. 77th Pl., Scottsdale, AZ 85255; and or P.O. Box 26494, Scottsdale, AZ 85255; and or 24403 N. Dobson Rd., Scottsdale, AZ 85255; and or 10414 SW. Bonanza Way, Portland, OR 97224.

B.     Nassar Alshaie, whose address and location is unknown at this time, but will be added to the Plaintiff's amended Complaint once it becomes known.

C.     Ahmed Alshaie, on information or belief, 10414 Bonanza, Tigard, OR 97224.

D.     Bernard Otremba-Blanc, 4218 W. Charlotte Dr., Glendale, AZ 85310; and or 1007 E. Missouri Ave., Phoenix, AZ 85014.

E.     Alshaie Family Trust, which true name and location is unknown at this time, but will be added to the Plaintiff's amended Complaint once it becomes known.

F.     Royal Holdings, LLC, 24003 N. Dobson Rd., Scottsdale, AZ 85255.

G.     Royal Energy, LLC, 23510 N. 77th Pl., Scottsdale, AZ 85255.

H.     Unknown Does 1-100; whose legal names and address locations are yet unknown, but will be added to Plaintiff's amended Complaint once they become known.

I.     XYZ Entities 1-100; whose legal names and address locations are yet unknown, but will be added to Plaintiff's amended Complaint once they become known.

**STATEMENT OF FACTS**

9.     The Plaintiffs were originally introduced to the Defendant Sultan on or about December 22, 2007.  Defendant Sultan claimed to be a part of the Saudi Royal Family.  This

introduction occurred at the German Consulate in Phoenix Arizona.  The Plaintiffs were introduced to Defendant Sultan by Defendant Bernard Otremba-Blanc, who claimed to be an honorary German Consul.

10.     The Plaintiffs were originally introduced to the Defendant Sultan on or about December 22, 2007.  Defendant Sultan claimed to be a part of the Saudi Royal Family.  This introduction occurred at the German Consulate in Phoenix Arizona.  The Plaintiffs were introduced to Defendant Sultan by Defendant Bernard Otremba-Blanc, who claimed to be an honorary German Consul.

11.     Based on numerous verbal commitments and agreements between Defendant Sultan and the Plaintiffs, the parties agreed to begin a venture of international investing into prestigious properties around the world.

12.     In or about February 2008, Defendant Sultan indicated numerous times that he intended to consummate their agreements and affirmed numerous times that he intended to complete a purchase of a prestigious property in Portugal.

13.     Sometime before January 2008 and March of 2008, based on promises by Defendant Sultan and other inducements, the Plaintiffs wired €500,000 to the sellers of a prestigious Portugal property as a down payment or earnest money.

14.     On or about March 31, 2008, the Plaintiffs performed their part of the agreement by releasing an additional €2.5 million as their deposit for the purchase of the Portugal property.

15.     In or about May 2008, after supplying significant due diligence materials, Defendant Sultan sent Defendant Bernard as his envoy to Madeira Portugal for an on-site due

4

diligence inspection with the express instructions that if the locations and physical facilities met with Defendant Bernard's approval, Defendant Sultan would complete the agreement required to purchase the property.  Defendant Bernard did in fact travel to, and inspect the property, and gave his full approval at the conclusion of that visit in or about May 2008.

16.     In or about May of 2008, after Defendant Bernard gave his approval, the Plaintiffs terminated all discussions with other possible outside investors in order to complete the agreement with Defendant Sultan to purchase the Portugal property.  In other words, at this point the Plaintiffs began to deal with the Defendant Sultan exclusively to complete this purchase.

17.     On or about July 24, 2008, Defendant Sultan provided a letter of commitment, a contract, to the sellers of the Portugal property along with proof of funds from the Bank of America showing account holdings of almost than $220 million US.

18.     In or about fall 2008, Defendant Sultan pledged his funds from a fuel trading transaction in order to complete the agreement with the Plaintiffs on the Portugal property. On information or belief, the fuel trade transaction transpired in or around January 2009, which produced Defendant Sultan's funds as pledged.  Based on discussions and statements from Defendant Sultan, the fuel was purportedly purchased from Kazakhstan through some unknown Russian intermediary, which fuel was sold to an unknown Italian company. According to Defendant Sultan, the Italian company experienced difficulty in paying for the transaction, and according to Defendant Sultan his family trust stepped in to pay for and complete the fuel transaction.  Based on further statements from Defendant Sultan, as the funds from the Italian company cleared, they were paid into the Defendant Family Trust.

19.     On information or belief, in February 2009, approximately $80 million US were wired from Defendant Sultan or Defendant Family Trust to a Swiss banking institution, UBS, in an account held for the benefit of the Defendant's family members and Defendant Sultan.

20.     At that time, the Plaintiffs and Defendant Sultan, through a mutual attorney at that time, completed a final investment agreement.

21.     On information and belief, it was later determined by the Plaintiffs that the transfer of funds by Defendant Sultan was in fact a decoy which allowed for multiple ghost transfers of exactly the same amount to be wired to other recipients in other parts of the world.  On information or belief, authorities from the United States government familiar with this transaction and others like it, including the parties involved, suspected that these funds were used for activities hostile to the United States and others.

22.     On information and belief, when the funds were deposited in UBS in New York in February of 2009, the Plaintiffs were told by Defendant Sultan that those funds immediately came under purview of the United States Patriot Act and were frozen pending an investigation.  To what extent additional wrongdoings occurred, the Plaintiffs have no direct knowledge; however, on further information or belief, the Plaintiffs believe that other agencies of the United States government were involved in investigating the Defendants funds.

23.     On further information or belief, the funds were finally released by the United States government for the Defendants use.  Defendant Sultan continued to claim to the Plaintiffs that he had no access to the funds even though the Plaintiffs were now aware that

the money was in fact released.  Knowing this, the Plaintiffs continued to perform in good faith towards completing the purchase of the Portugal property.

24.     On or about August 6, 2009, being suspicious that the Defendants were now unilaterally and intentionally breaching their agreement, the Plaintiffs, through new counsel made a written demand for performance.  That demand for performance was ignored and thereafter all communications with the Defendants ceased.

25.     Through new counsel's due diligence into the Defendants' actions, information about the Defendants, their history, and past practices brought to light the appearance of the Defendants' deceptive business practices, the appearance of fraudulent schemes, and the specter of illegal activity.

26.     The Defendants promoted themselves as international business investors who had knowledge, resources, and ability to transact business in prominent circles.  In support of their claims, the Defendants produced documents and references to establish their legend of success in past business.   In further support of their claims, the Defendants produced documents with the appearance of governmental authority.  One Defendant even produced a bank statement evidencing funds of almost of two hundred million dollars ($200,000,000.00) pledged to complete an agreement with the Plaintiffs.  The Defendants produced purported well respected business contacts to support their status. The Defendants also supported their claims by producing evidence of their business dealings by producing bank statements and other documents to support their claims as able investors.  In hindsight, the Defendants' actions appeared to be an elaborate ruse intentionally designed to induce the Plaintiffs into an international investment scheme.

27. For the present agreement, the Defendants arranged for the purchase of certain prestigious resort properties in Madeira, Portugal, a base agreement that exceeded approximately $54 million. [1] The agreement called for a joint venture whereby Defendant Sultan was to invest €34.3 million for an 80% share, and the Plaintiffs were to invest approximately $7 million for a 20% share. Each party was to raise their respective share of the funds and place them into escrow to purchase the property.

28. The Defendants' funds were procured and placed into one or more accounts to fulfill the obligations of the agreement. However, Defendant Sultan unilaterally and intentionally secretly withdrew his funds in a deliberate breach designed to cause the Plaintiffs substantial damage to their company and reputation.

29. On information and belief, the Defendants' actions were an endeavor to deceive authorities and to avoid criminal detection, all under a veil of legitimacy. On information or belief, the profits from the wire transfers were then transferred to the Defendants' accounts which the Defendants controlled, and were temporarily frozen by the United States government pursuant to the Patriot Act. Those funds were thereafter released on or about May 2009.

30. Both prior to and since May 2009, the Defendants have falsely and maliciously misrepresented their intentions with the intent to induce the Plaintiffs into justifiably relying on the Defendants' representations, which has caused the Plaintiffs to suffer great damages.

31. The Plaintiffs have recently discovered that it appears that the Defendants have

---

[1] This amount does not include profits.

defrauded others in the past, and suspect that the Defendants may be currently defrauding others raising serious questions concerning the Defendants' pattern of deceptive business practices.

32.     After retaining undersigned counsel, and after counsel's due diligence, on information or belief, the Defendants appear to be in the business of deceptively promoting and declining business opportunities to persuade investors to invest substantial sums of money, or see those investors lose money in the Plaintiff's business in the wake of the Defendants' breaching agreements.  The Defendants thereafter hide assets to the detriment of investors, and then the Defendants move their practices elsewhere.

33.     Since it is believed that the Defendants employ false or misleading information to induce would-be investors, and then divert assets to the detriment of investors, the present action is not only necessary to correct a most egregious injustice done to the Plaintiffs, but also to punish the Defendants for their willful and wanton fraudulent acts, and also to prevent them from further fraudulent acts against others.

34.     From August 2009 to present, the Plaintiffs retained undersigned counsel to investigate the possibility of the Defendants' wrongful conduct and other allegations.  As a result, counsel hired private investigators to conduct due diligence to discover the basis of the Plaintiff's allegations.

35.     As a part of their standard background investigation, the private investigators searched the public records of the Defendants and discovered, *inter alia*, what appeared to show the Defendants engaged in a pattern of deceptive business practices and or fraud schemes.  To the untrained eye, the Defendants' practices were both suspicious and possibly

actionable.  However, to the trained eye, the Defendants' appeared to be engaged in a pattern of deceptive business practices and a scheme to defraud investors.  It also appears that the Defendants are using their purported status and or influence for other hostile purposes.

36.     The private investigators discovered that some of the Defendants had numerous lawsuits filed against them, many of which the Defendants defaulted.  On information or belief, it also appeared that the Defendants were moving large sums of money around in various ghost bank accounts in what may be a kiting scheme. [2]  The more information that was produced, the more suspicious the Defendants actions became.

37.     With regard to one of the Defendants who pledged a substantial amount of money to complete his obligation to the Plaintiffs, an attempt to confirm those funds revealed that the account no longer existed, suggesting that the Defendant purposely diverted those funds to avoid detection.

## COUNT ONE – BREACH OF CONTRACT

38.     The Plaintiffs reincorporate paragraphs 1-37 above, and further allege as follows:

39.     Between late December 2007 and mid 2009, the Plaintiffs and the Defendants entered into an agreement whereby the parties were to purchase certain prestigious properties

---

[2]   While these allegations are not specifically plead here, one possibility exists that Defendant Sultan is creating and sending wire transfers of such significance that the funds are not made available for some period of time, all the while that banks are required to pay interest on money that is not actually received.  Some real amount of money is then used to justify earned interest when in fact the bulk of the funds are moved into another account while the Defendant still earns interest.

around the world, and particularly in Portugal.

40.     The Plaintiffs complied with all conditions precedent to the Defendants' performance under the agreement by completing the terms of their investment, depositing earnest money, and securing their portion of the funds to complete the purchase.

41.     Sometime during 2009, the Defendants breached the agreement described above by failing to secure their funds, failing to deposit their earnest money, and failing to complete the terms of their agreement.

42.     The Defendants' breach of their agreement is material and in no way constitutes substantial performance of the terms of the agreement.

43.     Throughout the relevant times herein, the Plaintiffs contacted the Defendants concerning the purchase of the properties.  The Plaintiffs were provided with numerous emails and documents showing that the Defendants made certain representations that were calculated to cause the Plaintiffs to believe that the agreement was going to be completed as represented.

44.     In fact, the Defendants' communications resulted in confusing and or misleading information as to the source, timing, and or approval, of the funds, and or closing of the properties.

45.     The Defendants also represented that the investments for the properties had the sponsorship, approval, characteristics, and benefits for the agreement, when in fact, the Defendants did not.

46.     The agreement was affirmed many times by Defendants.

47.     A copy of certain communications from the Defendants and others setting forth

48.     In or about January through March, 2008, the Plaintiffs deposited their earnest money according to their agreement for approximately €3.0 million, based on the Defendants' inducements.

49.     As a result of Defendants' acts and omissions, the Plaintiffs were thereafter damaged by the Defendants' breach causing them to lose the benefit of their bargain by not being able to purchase the properties, damaged in their reputation, and damaged with respect to their investors.  In addition, the Plaintiffs have lost their bargain in that the Plaintiffs lost profits in an amount that is estimated to be tens of millions of dollars.

50.     In the course of this transaction, the Defendants have engaged in false, misleading, and deceptive acts or practices in trade or commerce, in that it has failed to comply with express and implied warranties made regarding the residence.  Furthermore, the Defendants have engaged in false, misleading, or deceptive acts or practices in that appears that they intentionally induce people to invest in what appears to be legitimate opportunities, when in fact the Defendants intentionally withdraw from their obligations at the deteriment of those investors.

51.     The Plaintiffs may also show that the identity of the Defendants individually and the company entities are in substance one and the same, and that Defendants company entities are the alter ego of the individual Defendant, acting solely as a conduit for the performance of individual Defendant's business, and as a device to cause harm or prejudice to those dealing with it.  In support, the Plaintiff would show the following:

A.     Individual Defendants ignore the separate existence of Defendant

entities in numerous ways, including failing to conduct regular meetings, failing to maintain business records other than routine records, and that some of the entities themselves may be in default.

52.     Plaintiff further alleges that Defendant's business entities and or Family Trust is virtually insolvent and may be out of business, and the Plaintiffs therefore invoke the Trust Fund Doctrine and allege that the Defendants are placed in a fiduciary relationship, and owe a fiduciary duty to Plaintiffs and to all Plaintiff's investors.

53.     The Plaintiffs believe that the Defendants should hold their assets in trust for the Plaintiffs and their investors and that this duty obliges the Defendants to administer their assets for the benefit of the Plaintiffs and their investors.

54.     If the Defendants have allowed their assets to become dissipated, then the Plaintiffs would show that it is a breach of a fiduciary duty and they are therefore liable to the Plaintiffs for such breach.

55.     The Plaintiffs further would show that the Defendants participated in, were aware of, and acquiesced in the deceptive trade practices, and as joint violators, would be jointly and severally liable for such violations.

## COUNT TWO – FRAUD

56.     The Plaintiffs reincorporate paragraphs 1-55 above, and further allege as follows:

57.     On or about December 22, 2007, the Defendants falsely and fraudulently, and with intent to defraud the Plaintiffs, represented to the Plaintiffs that they were successful International and Saudi Businessmen and as Members of foreign governments and or the

Saudi Royal Family, by and through the Family Trust, were interested in making investments in U.S. companies such as the Plaintiff's.

58.     These representations were false in fact, and known to be false by the Defendants at the time they were made.  In truth and in fact the claim of wanting to invest in American Businesses simply provided a validation of the legend in which the defendants operated.   Rather than pursuing legitimate business operations, they were in fact more interested in pursuing an agenda tied to other illicit and nefarious acts.   In addition, the Honorary German Consul Dr. Bernard Otremba-Blanc, represented himself as an intermediary though investigations performed by the Plaintiffs by a private investigations firm found otherwise.  He is, in fact, a director of both Royal Holdings and Royal Energy.

59.     The Plaintiffs were ignorant of the falsity of the representations, and believed them to be true.

60.     The Plaintiffs relied upon the representations, and were induced to deposit millions of Euros in funds with the sellers, spend millions of dollars in marketing, legal, travel, pre-development and pre-sales expenses, and cease discussions with all other interested funding parties.   Based on continued commitments, representations, and communications both written and telephonically to the Plaintiffs and the sellers of the Madeiran Hotels, the Plaintiffs waited in good faith for the ability to sell residential real estate associated with the hotel properties which said opportunity never realized.

61.     The year-long delay for the promised closing of the transaction and the ultimate failure to perform of the defendants has inflicted significant and irreparable damages to the Plaintiffs, both as a company and its principals.  At this time, the Plaintiffs have lost

14

the Hotel transaction in Madeira for the purchase of the Charming Hotels and all monies it has invested including down payments, legal expenses, marketing expenses, travel, and otherwise, amounting to more than $8 million US.  In addition, the Plaintiffs have lost its share of the profit resulting from the fractional sale and redevelopment of the property of approximately $86,428,200.   The Plaintiffs have also suffered irreparable damage to its reputation, and delayed sales have put the company and its principals in near financial ruin.

### COUNT THREE - MISREPRESENTATION

62.    The Plaintiffs reincorporate paragraphs 1-61 above, and further allege as follows:

63.    The Defendants, on numerous occasions, represented to the Plaintiffs that they were ready, willing, and able to complete the transaction they agreed to.

64.    The Defendants communicated on numerous occasions through e-mail, telephone, and otherwise that they intended to complete the purchase of the properties in Portugal; each communication designed to induce the Plaintiffs into completing their part of the transaction.

65.    The Defendants' representations were false and the Defendants knew the representations were in fact false.

66.    The Defendant's representations were material in that the Defendants continuously misrepresented their true intentions, and on information and belief used the agreement and transaction for some illegitimate means such that a reasonable person would attach importance to such information when determining a course of action based on the Defendants' representations.

15

67.     The Defendants had knowledge the representations were false or Defendants were ignorant of its truth.

68.     The Defendants intended for this representation to be acted upon in that Defendants knew that the Plaintiffs had a duty to inspect the properties and their investors, and for the Plaintiffs to deposit their earnest money and pay other expenses at the Plaintiff's expense.

69.     The Plaintiff's expenditures were in a manner which may reasonably be contemplated by Defendants.

70.     The Plaintiffs were ignorant of the Defendants' false representations.

71.     The Plaintiffs relied on the Defendants' false representations in that Plaintiffs responded in good faith on the representations made by the Defendants in that they did in fact make their deposit of earnest money for approximately €3 million in reliance on the Defendants falsely representations.

72.     The Plaintiffs had a right to rely on the Defendants' false representations as both parties were represented by mutual counsel at one time who affirmed in writing that there was in fact a contract.

73.     The Plaintiff's consequential and proximate damages resulted from their reliance on the defendants false representations to their detriment for over €3 million.

## ALLEGATION OF MALACE AND SPECIAL DAMAGES

74.     The Plaintiffs reincorporate paragraphs 1-73 above, and further allege as follows:

75.     The Defendants, and each of them, acted with and conducted themselves

intentionally and maliciously, and without reasonable and just cause, to such a degree that an award of special and or punitive damages is warranted.

## COUNT FOUR - INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS

76.     The Plaintiffs reincorporate paragraphs 1-75 above, and further allege as follows:

77.     The Plaintiffs are now, and at all times mentioned in this Complaint are a party to the transaction in Madeira, Portugal.

78.     The Defendants at all times mentioned in this Complaint have continually and unequivocally promised, purported and agreed to complete the transaction in Madeira, Portugal.

79.     The Defendants have wrongfully and fraudulently induced the Plaintiffs into certain actions with no real intent to perform as promised, causing great harm to the Plaintiffs.

80.     As a result of the Defendants' acts, the Plaintiffs have sustained and will sustain great and irreparable injury including loss of reputation, millions of dollars invested in the project to date, and lost profits from the project.

81.     The Plaintiffs cannot be fully compensated in damages, is without an adequate remedy at law because the exact amount of damage to the Plaintiffs will be difficult to determine.

82.     As a further result of the Defendants' acts, the Plaintiffs have sustained damage in the amount of ninety four million, eight hundred eighty nine thousand, eight hundred seven dollars and three cents ($94,889,807.03).

17

83.     If these acts are permitted to continue, the Plaintiffs will be further damaged in an amount to be alleged when additional damages have been determined.

84.     The Plaintiffs have moved, under separate cover, for a Temporary Restraining Order, filed contemporaneously with this Complaint.

WHEREFORE, the Plaintiffs demand judgment against Defendants jointly and severally for:

A.     Damages in an amount to be proven at trial, for the Defendants' breach of their agreement.

B.     Consequential damages for the Plaintiff's lost profits in an amount to be proved at trial.

C.     Rescission of the agreement between the Plaintiffs and Defendants, and the return of all of the Plaintiff's moneys or other valuable consideration given by the Plaintiffs as conditions precedent to the Defendants' performance.

D.     The Plaintiff's costs incurred herein.

E.     The Plaintiff's reasonable attorneys' fees.

F.     Any and all applicable pre- and post-judgment interest from the date incurred.

G.     For such other and further relief as the Court deems just in the premises.

Dated this 18th day of November, 2009.

**THE POSTER LAW FIRM, PLLC.**


_____*s/ Rick Poster*_____
Rick Poster
Attorney for the Plaintiff

1

2

I certify that on this 18th day of November, 2009, I electronically filed the foregoing Complaint to the Clerk's Office using the CM / ECF system.

3

By:   _s/Rick Poster_____

4

5

Plaintiff's Verification filed separately.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25